DISTRICT COURT OF THE VIRGIN ISLANDS
DIVISION OF ST. THOMAS AND ST. JOHN

KRISTIN MANNION,                  )
                                  )
            Plaintiff,            )
                                  )
            v.                    )    Civil No. 2013-120
                                  )
CBI ACQUISITIONS, LLC, and        )
ROSEWOOD HOTEL & RESORTS LLC,      )
                                  )
            Defendants.           )
                                  )
                                  )

ATTORNEYS:

**Samuel H. Hall, Jr., Esq.**
Hall & Griffith, P.C.
St. Thomas, VI
      *For the Plaintiff,*

**Matthew J. Duensing, Esq.**
Stryker, Duensing, Casner & Dollison
St. Thomas, VI
      *For the Defendants.*


## MEMORANDUM OPINION[1]

**GÓMEZ, J.**

      Before the Court is the motion of defendants CBI

Acquisitions, LLC, and Rosewood Hotel and Resorts, LLC for

summary judgment.

_____

[1] The Court ruled on the motions discussed herein at a hearing held on
December 8, 2014. This opinion outlines the rationale for the Court's
rulings.

*Mannion v. East End Watersports, et al.*
Civil No. 2013-61
Memorandum Opinion
Page 2

## I. FACTUAL AND PROCEDURAL BACKGROUND

Kristin Mannion ("Mannion") is a resident of the District of Columbia.  In December, 2011, Mannion, her husband, and their two children, traveled to the United States Virgin Islands for vacation. Mannion and her family stayed at Caneel Bay Resort ("Caneel Bay" or the "hotel"), a resort located on St. John, United States Virgin Islands. Caneel Bay was owned by CBI Acquisitions, LLC ("CBI") and operated by Rosewood Hotel and Resorts, LLC ("Rosewood").

East End Watersports, Ltd. d/b/a Nauti Nymph Powerboat Rentals ("Nauti Nymph") is a provider of charter boat services. When an individual charters an excursion through Nauti Nymph, Nauti Nymph provides a vessel which is operated by an independent captain that Nauti Nymph allows to captain the vessel.

At all relevant times, CBI had an agreement with Nauti Nymph. Pursuant to that agreement, Nauti Nymph had an exclusive license to provide motorized vessel excursions for guests and patrons of Caneel Bay leaving from Caneel Bay's dock. CBI and Rosewood employees promoted Nauti Nymph's services (the "excursion agreement"). Caneel Bay staff would bill the cost of Nauti Nymph charters to guests' hotel bills.  Nauti Nymph would

provide CBI with a portion of the revenue derived from charters for Caneel Bay guests.

Mannion and her husband inquired with the hotel concierge about a charter. Mannion and her husband specified that they wanted a charter trip that would move slowly and avoid rough water. The concierge recommended Nauti Nymph.  Thereafter, Mannion's husband booked a charter through Nauti Nymph.  Russell Charette ("Charette") was the captain of the vessel used for the Mannion family charter.

Prior to their departure from the Caneel Bay dock, Mannion and her husband advised Charette that the family did not like speed or rough waters. As the boat left the dock, Mannion and her daughter knelt on floor cushions in the bow of the boat. While Mannion was kneeling in the bow, the boat came upon rough waters.  The boat hit waves from passing boats.  This impact led to Mannion being thrown into the air before landing on the deck of the boat.  Mannion was unable to move from where she had landed, due to pain. She was also bleeding. Following Mannion's injury, at the family's request, Charette returned the boat to Caneel Bay.

It was later discovered that Mannion had: two compression fractures of vertebrae in her lumbar spine; a proximal fibula fracture; a spiral oblique nondisplaced fracture of the distal

*Mannion v. East End Watersports, et al.*
Civil No. 2013-61
Memorandum Opinion
Page 4

metadiaphyseal unction of the right fibula; a cut on her right knee; and a torn left knee medial collateral ligament. Mannion alleges that because of these injuries, she has endured: great pain and suffering; lost income; and lost enjoyment of life.

Mannion filed suit against Nauti Nymph and Charette on June 18, 2013 (the "Nauti Nymph action"). In her complaint, Mannion alleged negligence and gross negligence against both Nauti Nymph and Charette. Thereafter, on December 10, 2013, Mannion filed suit against CBI and Rosewood (the "CBI action"). In her complaint against CBI and Rosewood, Mannion alleged negligence and gross negligence against both CBI and Rosewood. The Magistrate Judge consolidated the Nauti Nymph and CBI actions on February 28, 2014, under case number Civil 2013-61.

CBI and Rosewood filed the instant motion for summary judgment on October 1, 2014. In their motion, CBI and Rosewood assert that they are not liable for negligence or gross negligence as a matter of law because the charter excursion took place outside of their sphere of control. As such, CBI and Rosewood seek judgment in their favor on both claims brought against them by Mannion. Mannion opposes the motion.

## II. <u>DISCUSSION</u>

Summary judgment is appropriate if "the pleadings, the discovery and disclosure materials on file, and any affidavits

*Mannion v. East End Watersports, et al.*
Civil No. 2013-61
Memorandum Opinion
Page 5

show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); *see also Hersh v. Allen Products Co.*, 789 F.2d 230, 232 (3d Cir. 1986).

The movant has the initial burden of showing there is no genuine issue of material fact, but once this burden is met it shifts to the non-moving party to establish specific facts showing there is a genuine issue for trial. *Gans v. Mundy*, 762 F.2d 338, 342 (3d Cir. 1985). The non-moving party "may not rest upon mere allegations, general denials, or . . . . vague statements . . . ." *Quiroga v. Hasbro, Inc.*, 934 F.2d 497, 500 (3d Cir. 1991). "[T]here is no issue for trial unless there is sufficient evidence favoring the non-moving party for a jury to return a verdict for that party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).

"[A]t the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Id.* In making this determination, this Court draws all reasonable inferences in favor of the non-moving party. *See Bd. of Educ. v. Earls*, 536 U.S. 822, 850 (2002); *see also Armbruster v. Unisys Corp.*, 32 F.3d 768, 777 (3d Cir. 1994).

*Mannion v. East End Watersports, et al.*
Civil No. 2013-61
Memorandum Opinion
Page 6

### III. <u>ANALYSIS</u>

In considering whether the Defendants have met their burden
of showing there is no genuine issue of material fact and that
they are entitled to judgment as a matter of law, the Court may
consider the pleadings, the discovery and disclosure materials
on file, and any affidavits. *See* Fed. R. Civ. P. 56(c). In
support of their motion, CBI and Rosewood have submitted:
deposition testimony; the excursion agreement between CBI and
Nauti Nymph; the management agreement between CBI and Rosewood;
documents memorializing the agreement between Mannion's husband,
Charette, and Nauti Nymph for the charter; and the pleadings.

Mannion alleges in her complaint that CBI and Rosewood were
negligent and grossly negligent. Though her negligence claim is
a single count, Mannion seems to assert four negligence theories
for relief: innkeeper liability for the excursion; negligent
recommendation; joint venture or partnership liability; and
agency liability.

To sufficiently allege any negligence claim, a plaintiff's
claim must contain four elements: (1) duty, (2) breach of duty,
(3) causation, and (4) damages. *White v. Spenceley Realty, LLC*,

*Mannion v. East End Watersports, et al.*
Civil No. 2013-61
Memorandum Opinion
Page 7

53 V.I. 666, 2010 WL 4961792, *3 (2010)(citing to Restatement

(Second) of Torts § 281).[2]

CBI and Rosewood have moved for summary judgment on Count

One, negligence, and Count Two, gross negligence.  CBI and

Rosewood do not dispute that Mannion has suffered an injury or

that the injury was caused by the rough waters Mannion

encountered during the charter trip. Rather, in support of their

motion for summary judgment, CBI and Rosewood argue that they

did not owe a duty of care to Mannion because the charter took

place off premises and was not within the hotel's sphere of

control. CBI and Rosewood further assert that Nauti Nymph and

Charette were not agents or partners of CBI and Rosewood, and

that therefore CBI and Rosewood cannot be liable for the actions

of Nauti Nymph and Charette as a matter of law.

**A. Innkeeper Liability**

CBI and Rosewood first argue that they did not owe Mannion

a duty of care because the alleged injury occurred off of the

hotel's premises.

--------

[2] The Court notes that this action is controlled by maritime tort law. "The
analysis of a maritime tort is guided by general principles of negligence
law. Under general tort principles, a tortfeasor is accountable only to those
to whom a duty is owed." *In re Signal Int'l, LLC*, 579 F.3d 478, 491 (5th Cir.
2009)(internal citations and quotations omitted).

Tort law recognizes a special relationship between innkeepers and their guests. *See, e.g.*, Restatement (Third) of Torts: Phys. & Emot. Harm § 40 (2012); Restatement (Second) of Torts § 314A (1965). This special relationship gives rise to a duty of reasonable care with regard to risks that arise within the scope of the relationship. Restat. 3d (Torts): Phys. & Emot. Harm § 40(a). This duty is

> bounded by geography and time. Thus, this Section imposes no affirmative duty on a common carrier to a person who left the vehicle and is no longer a passenger. Similarly, an innkeeper is ordinarily under no duty to a guest who is injured or endangered while off the premises. Of course, if the relationship is extended—such as by a cruise ship conducting an onshore tour—an affirmative duty pursuant to this Section might be appropriate.

*Id.* (comment f). That said, within these bounds, the duty owed by innkeepers to their guests "applies regardless of the source of the risk. Thus, it applies to risks created by the individual at risk as well as those created by a third party's conduct, whether innocent, negligent, or intentional." *Id.* (comment g).

In considering the outer limits of an innkeeper's liability to its guests, "courts have applied the 'sphere of control' concept to determine whether a duty exists . . . ." *Fabend v. Rosewood Hotels & Resorts, L.L.C.*, 381 F.3d 152, 155 (3d Cir. 2004). An area is "within [the hotel's] 'sphere of control' if they had the legal right to control the conditions and use of

*Mannion v. East End Watersports, et al.*
Civil No. 2013-61
Memorandum Opinion
Page 9

the area, or possessed the area and evidenced an intent to control it even absent clear legal authority. In conducting this inquiry, [the Third Circuit] consider[s] who had the legal authority to control the area, including the right to control access, establish rules for use, and mitigate or warn of any dangerous conditions." *Id.* at 157.

CBI and Rosewood assert that Nauti Nymph charters took place outside of their sphere of control. In support of that contention, CBI and Rosewood have submitted the deposition testimony of: Paul Kazyak ("Kazyak"), director of finance for Caneel Bay and a corporate representative of CBI, and Jeralda Thomas ("Thomas"), assistant guest relations manager at Caneel Bay. Finally, CBI and Rosewood rely upon the contracts between Mannion's husband, Harold Goldfield ("Goldfield"), Nauti Nymph, and Charette for the charter trip and the excursion agreement between CBI and Nauti Nymph.

Kazyak testified that "we [at Caneel Bay] don't control any part of their [Nauti Nymph's] business." (Kazyak Dep. 16:15.) As to the hotel's relationship with Nauti Nymph, Kazyak stated that the hotel's tracking of Nauti Nymph's compliance with the excursion agreement it had with CBI was limited to CBI making sure Nauti Nymph had a current business license and insurance. (*Id.* 21:8-9.) Kazyak further testified that, pursuant

to the excursion agreement, if guests requested powerboat charters, Nauti Nymph "would be put in front of [the guest] first for them to choose whether they wanted to use Nauti Nymph or choose one of the other vendors in the V.I." (*Id.* 21:20-24.) Kazyak also indicated that the brochures advertising Nauti Nymph and distributed at Caneel Bay stated that Nauti Nymph was a separate entity from Caneel Bay. (*Id.* 23:4-7, 24:12-15 ("Q: I'm just trying to understand exactly what is communicated as far as power boating, whether it's an outside activity or whether it's an in-house activity.  A: Definitely outside.")

Kazyak further testified that CBI does not own any of the boats used by Nauti Nymph. (*Id.* 27:22-24.) When asked what kind of financing Caneel Bay may have supplied to Nauti Nymph, Kazyak stated, "No. They are an independent contractor. We have nothing to do with their financing, with how they really run their business." (*Id.* 28:2-4.) Beyond allowing Nauti Nymph to provide brochures through the hotel's concierge desk, and allowing Nauti Nymph to use the hotel's dock to tie up, pick up, and discharge, Kazyak was unaware of anything else provided by CBI to Nauti Nymph. (Kazyak Dep. 28:5-12.) Though Kazyak testified that the agreement between Caneel Bay and Nauti Nymph allowed CBI to audit Nauti Nymph and to screen Nauti Nymph's employees, Kazyak stated that CBI had never taken either action. (*Id.* 28:14-29:7.)

*Mannion v. East End Watersports, et al.*
Civil No. 2013-61
Memorandum Opinion
Page 11

Finally, Kazyak testified that twenty-five percent of gross sales for Nauti Nymph charters went to CBI and, through a management fee, were passed on in part to Rosewood. (*Id.* 17:8-11; 31:5-10.)

Thomas testified during her deposition regarding the general circumstances as to how charters are booked at Caneel Bay.  Specifically, she stated that charters are booked through the hotel's concierge. (Thomas Dep. 20:12-13.) The concierge staff was told to recommend Nauti Nymph. (*Id.* 22:11-21.) Thomas indicated that though the concierge staff would not itself book charters through companies other than Nauti Nymph, guests were told they could do so. (*Id.* 22:4-10.) Thomas stated that hotel guests were told that the hotel was not providing the charter, but that it was done through an independent company. (*Id.* 20:21-24.) Once the charter was booked, the concierge would let the guest know the price, dates, and times. (*Id.* 20:13-17.)  Thomas further testified that guests were notified of cancellation policies by the concierge. (*Id.* 20:17-18.) Finally, the guest would meet the captain and do any necessary paperwork before leaving. (*Id.* 20:18-20.)

CBI and Rosewood also submitted a copy of the excursion agreement between CBI and Nauti Nymph which stated, in pertinent part, that the

*Mannion v. East End Watersports, et al.*
Civil No. 2013-61
Memorandum Opinion
Page 12

> Resort shall endeavor to encourage the use of
> the Activities by the guests and patrons of the
> Resort; provided, however, that notwithstanding
> anything contained in this Agreement to the
> contrary, nothing shall prohibit Resort's guests
> and patrons from entering into agreements with
> the other providers of the Activities directly.

(ECF No. 93-3, Ex. C.) The excursion agreement further stated
that the relationship between Nauti Nymph and Caneel Bay, as
operated by Rosewood, did not create a joint venture or a
partnership between Nauti Nymph and CBI. (*Id.*) The excursion
agreement specified that employees of Nauti Nymph were not
employees of CBI or Rosewood for any purpose. (*Id.*)

Finally, CBI and Rosewood direct the Court to the agreement
between Goldfield and Charette (the "captain contract"). The
captain contract provides that the customer has hired or leased
a powerboat from Nauti Nymph. (ECF No. 93-11, Ex. K.) The
captain contract further states that the customer hires the
captain, and agrees that no employment or other relationship
exists between the captain and Nauti Nymph. (*Id.*) Neither CBI
nor Rosewood is mentioned in the captain contract at all. (*Id.*)

To determine whether CBI or Rosewood owed a duty of care to
Mannion, the Court is tasked with determining whether the
actions and area from which Mannion's injuries arose were within
the sphere of control of CBI or Rose. *See, e.g.*, *Fabend*, 381
F.3d at 157.

*Mannion v. East End Watersports, et al.*
Civil No. 2013-61
Memorandum Opinion
Page 13

This case shares some similarities with *Burdeaux v. Royal Caribbean Cruises, Ltd.*, 562 F. App'x 932 (11th Cir. 2014).  In *Burdeaux*, Royal Caribbean Cruises, Ltd. ("Royal Caribbean"), a cruise line, had an agreement with a number of shops in a particular shopping area in Cozumel, Mexico. *Burdeaux v. Royal Caribbean Cruises, Ltd.*, 562 F. App'x 932, 934 (11th Cir. 2014). Under this agreement, Royal Caribbean would recommend those shops to its passengers. *Id.* The shops were "guaranteed and recommended" shops, and were marked on a map with a number and description. *Id.* In exchange, the shops would provide Royal Caribbean with revenue derived from the sale of items to cruise line passengers. *Id.* Brittany Burdeaux ("Burdeaux"), a Royal Caribbean cruise passenger, disembarked from the ship, and went shopping in the area in which the select shops were located. *Id.* While Burdeaux was there, she came across an individual who asked Burdeaux to follow him to a store the cruise line had not "guaranteed and recommended." *Id.* Burdeaux did so, and was assaulted by the individual and four other men. *Id.*

Burdeaux sued Royal Caribbean for negligently failing to warn her about the dangers of shopping in Cozumel, in an area where Royal Caribbean had specifically invited passengers to visit. *Id.* The Eleventh Circuit, in considering the issue, found that the cruise line could not be held liable.  *Id.* at 936-37.

*Mannion v. East End Watersports, et al.*
Civil No. 2013-61
Memorandum Opinion
Page 14

Though cruise ships have a heightened duty to protect their passengers, the Eleventh Circuit stated that there was no duty to warn of an off-ship risk due to causes the cruise line had no reason to anticipate. *Id.*[3]

In *Fabend v. Rosewood Hotels & Resorts, LLC*, 381 F.3d 152, 46 V.I. 668 (3d Cir. 2004), Caneel and Rosewood held a license to operate a campground and water sport rental service on land owned by the National Park Service. *Fabend*, 381 F.3d at 157. In the licensing agreement, the National Park Service did not relinquish its control of the beach to Caneel or Rosewood. *Id*. A guest to the campground was injured while swimming at the beach. *Id*. at 154. The Third Circuit characterized the sphere of control test by stating

> As Comment c makes clear, the duty to protect, and hence the duty to warn, exists only where the risk arises from the relationship, and it is not alone sufficient that a guest is exposed to a risk during the period he remains such ... A risk arises in the course of the relationship only if it occurs on the relevant premises ... The specific factual setting of a case will ultimately dictate whether a party is in the position to control or has the power to control

---

[3] Cruise lines have a heightened duty to cruise ship passengers as "common carriers." This duty mirrors that of innkeepers on land. *See, e.g.*, Restatement (Third) of Torts: Phys. & Emot. Harm § 40; Restatement (Second) of Torts § 314A ("(1) A common carrier is under a duty to its passengers to take reasonable action[:] (a) to protect them against unreasonable risk of physical harm, and (b) to give them first aid after it knows or has reason to know that they are ill or injured, and to care for them until they can be cared for by others. (2) An innkeeper is under a similar duty to his guests.")

*Mannion v. East End Watersports, et al.*
Civil No. 2013-61
Memorandum Opinion
Page 15

> land adjacent to his property such that a duty
> to protect or warn arises ... The "sphere of
> control" test requires that we look at the
> circumstances of the case to ascertain whether
> sufficient control exists over the adjacent
> premises.

*Id.* at 155-56.

In considering whether the area was within the sphere of control of Caneel and Rosewood, the Third Circuit stated in pertinent part that

> It is undisputed that the park, including the
> swimming area, was owned by the federal
> government, and that the National Park Service
> had the right to exercise exclusive control over
> activity in that area. While the National Park
> Service had granted a license to Caneel and
> Rosewood, that license was limited under the
> controlling documents to the operation of cabins
> and a campground, a gift shop, and a water
> sports shop at locations assigned by the
> National Park Service, subject to certain
> controls retained by the National Park Service.
> For present purposes, the critical fact is that
> the National Park Service, except to the extent
> of authorizing operation of a water sports shop,
> did not in those documents surrender any control
> of the beach to Caneel or Rosewood. It follows
> that Caneel and Rosewood had no actual authority
> to control the swimming area where Fabend was
> injured. The National Park Service retained that
> authority and exercised it by promulgating
> regulations governing activities there and,
> indeed, publishing warnings of risks to be found
> there.

*Fabend*, 381 F.3d at 157.

Similarly instructive is the case of *Manahan v. NWA*, 821 F. Supp. 1105 (D.V.I. 1991) *aff'd sub nom. Manahan v. NWA Inc.*, 995

*Mannion v. East End Watersports, et al.*
Civil No. 2013-61
Memorandum Opinion
Page 16

F.2d 218 (3d Cir. 1993).  In *Manahan*, a hotel guest sought the recommendation of the concierge as to whether or not it was safe to walk a particular route at night. *Id.* at 1108. The concierge advised the guest that it would be safe to walk at night between the hotel and a local restaurant. *Id.* While walking between the hotel and the restaurant, the guest was assaulted. *Id.* at 1109. Though the recommendation was given at the hotel, the Court focused on the location of the injury caused by actions of a third party. *Id.* at 1109.

> Under common law, an innkeeper is under a duty to its guests to take reasonable action to protect them against unreasonable risk of physical harm. However, such proprietor "is not bound to anticipate and guard against the unusual or abnormal, or against something which reasonable care, skill, or foresight could not have discovered or prevented."

*Id.* at 1108. The Court considered that the concierge and the hotel were not aware of previous injuries to guests as a result of walking at night. *Id.* at 1109. The Court also considered the fact that the injury had been caused by a third party off of the hotel's premises. *Id.* The Court held that the hotel could not be liable to the guest as a matter of law. *Id.*

By contrast, where a hotel rents equipment to a guest and encourages, either explicitly or implicitly, that guest to use the equipment in a way that the hotel knows is unsafe, the hotel may be liable.  *See, e.g., Dadgostar v. St. Croix Fin. Ctr.,*

*Mannion v. East End Watersports, et al.*
Civil No. 2013-61
Memorandum Opinion
Page 17

*Inc.*, Civ. No. 10-28, 2011 WL 4383424 (D.V.I. Sept. 20, 2011).

For example, in *Pacheco v. United States*, 220 F.3d 1126 (9th
Cir. 2000), a United States agency sold beach tickets to a
family and provided the child with toys meant for playing in the
water. *Pacheco v. United States*, 220 F.3d 1126, 1131. The beach
had a known, dangerous riptide that the child's family was
unaware of. *Id.* In using the toy in the way it was intended, the
child, and two adults, were pulled out to sea by the riptide and
drowned. *Id.* at 1132. The Ninth Circuit stated that the facts
could support a claim based on the theory that the defendants
invited the child to play in an area that the defendants knew to
have a riptide. *Id.*

Such a case is distinguishable from the facts presented
here.  Though CBI and Rosewood assisted Mannion in procuring the
instrument that ultimately resulted in her injury, unlike the
United States in *Pacheco*, CBI and Rosewood did not own it and
did not in any way indicate to Mannion how she was to use that
instrument. In *Pacheco*, the United States may have invited the
injured child to play in a dangerous tide by giving her toys
meant for playing in the water. *See id.* The United States was
the direct provider of the instrument and instructor on its use.
*See id.*

Here, CBI and Rosewood introduced Mannion's family to Nauti Nymph. Unlike *Pacheco*, there is no indication that either CBI or Rosewood had knowledge that the excursion offered by Nauti Nymph would be dangerous. The evidence suggests that neither CBI nor Rosewood did or would have reason to know of either the wake or any negative information about the captain's handling of the boat prior to Mannion's excursion. That is, neither party had any reason to anticipate that Charette would happen upon a large wake or any reason to think Charette would not handle such an event properly.

The circumstances here, like those in *Fabend* and *Burdeaux*, indicate that even under the heightened duty of care imposed on innkeepers, Caneel Bay had no duty to Mannion. Considering first the issue of the sphere of control, the excursion agreement allowed very limited interference into Nauti Nymph's business operations – audits, and screening potential employees – but went no further. Furthermore, even if such authority existed, it does not appear to have been exercised. *See id.* at 158 ("There is no question that Caneel and Rosewood had actual authority to post signs necessary or appropriate to the operation of a campground and the water sport shop, but that is of no legal significance here. What is important is that there is no evidence that they ever posted a sign purporting to direct

*Mannion v. East End Watersports, et al.*
Civil No. 2013-61
Memorandum Opinion
Page 19

or control activities in the swimming area.") Nauti Nymph did not surrender to CBI or Rosewood authority or control over Nauti Nymph's boats, charter routes, hours, rules, or regulations. The Court thus finds the holding in *Fabend* to be instructive on this issue.

Furthermore, *Burdeaux* and *Manahan* counsel against a finding that CBI or Rosewood owed any duty to warn. Like in *Burdeaux*, CBI and Rosewood made recommendations of certain vendors in exchange for money based upon those vendors' sales. The injured party here, as in *Burdeaux*, chose to follow those recommendations. Thereafter, while the plaintiff was with a third party and was off-premises (or off-ship), the plaintiff suffered an injury.

Here, the record demonstrates that the injury occurred off of the hotel's premises due to the plaintiff's interaction with a third party, Nauti Nymph. Kazyak testified that reviews of Nauti Nymph received by the hotel have all been positive. (Kazyak Dep. 22:2-10.) That is, Caneel Bay, and through it CBI and Rosewood, had not received any negative information. There is no other evidence on the record which supports any inference that CBI or Rosewood knew of any problem with Nauti Nymph excursions. A thorough review of all of the evidence submitted in this matter also shows that there is no record evidence that

*Mannion v. East End Watersports, et al.*
Civil No. 2013-61
Memorandum Opinion
Page 20

either CBI or Rosewood had any reason to know of any *potential*

danger arising from the use of Nauti Nymph or Charette. In fact,

the Court notes, Mannion does not allege any incident of which

CBI and Rosewood should have been aware that might demonstrate

that Nauti Nymph posed a danger. Thus, as in *Burdeaux*, Caneel

Bay had no duty to warn Mannion or to otherwise alter their

recommendation, even under the heightened duty of care owed by

innkeepers.

**B. Joint Venture Liability**

CBI and Rosewood also assert that they were not involved in

a partnership or joint venture with Nauti Nymph or Charette,

such that CBI or Rosewood might be liable for Nauti Nymph or

Charette's actions. "Joint ventures are generally governed by

partnership law and, like a partner, a member of the venture may

be regarded as both a principal and an agent of the other co-

venturers." *N.L.R.B. v. Sheet Metal Workers' Int'l Ass'n, Local

Union No. 19*, 154 F.3d 137, 143 (3d Cir. 1998.) "[T]he acts of

one joint venturer are binding upon other joint venturers if

those acts pertain to matters within the scope of the joint

venture and the joint venturer had authority to act." *Hyler v.

Geo-Seis Helicopters, Inc.*, 269 F.3d 1190, 1193 (10th Cir.

2001); *accord* Restatement (Second) of Torts § 491, comment b;

*Guerro v. Bluebeard's Castle Hotel Inc.*, 982 F. Supp. 343, 37

*Mannion v. East End Watersports, et al.*
Civil No. 2013-61
Memorandum Opinion
Page 21

V.I. 344 (D.V.I. 1997)(considering whether a joint venture

existed such that negligence liability could be imputed).

> Courts generally look to four factors to determine whether the parties to an endeavor are joint venturers:
>
> (1) whether there is an express or implied agreement that demonstrates the parties' intent to form a partnership or joint venture; (2) whether the parties share a common interest in the subject matter of the joint venture; (3) whether the parties share profits and losses from the venture; and (4) whether the parties have joint control or the joint right of control over the venture.

*Int'l Raw Materials, Ltd. v. Stauffer Chem. Co.*, 978 F.2d 1318,

1332 (3d Cir. 1992).

CBI and Rosewood assert that they were not part of a joint

venture with Nauti Nymph or Charette. In support of this

argument, CBI and Rosewood again direct the Court's attention to

the deposition testimony of Kazyak and Thomas, as well as the

deposition testimony of Ute Bitschnau-Moraino, an owner of CBI.

CBI and Rosewood also rely on the excursion agreement between

the hotel and Nauti Nymph.

As discussed above, Kazyak testified that CBI does not

control any part of Nauti Nymph's business. (Kazyak Dep. 16:15.)

Kazyak stated that, pursuant to the excursion contract, the

hotel did some limited tracking of Nauti Nymph's business

license and insurance. (*Id.* 21:8-9.) Though Kazyak testified

that the agreement between CBI and Nauti Nymph allowed the hotel
to audit Nauti Nymph and to screen Nauti Nymph's employees,
Kazyak stated that CBI had never taken either action. (*Id.*
28:14-29:7.) Kazyak testified that CBI does not own any of the
boats used by Nauti Nymph. (*Id.* 27:22-24.) When asked what kind
of financing CBI may have supplied to Nauti Nymph, Kazyak
stated, "No. They are an independent contractor. We have nothing
to do with their financing, with how they really run their
business." (*Id.* 28:2-4.) Kazyak also indicated that in the
brochures advertising Nauti Nymph and distributed at Caneel Bay,
it was evident that Nauti Nymph was a separate entity from
Caneel Bay. (Id. 23:4-7, 24:12-15.)

Kazyak testified that if guests requested powerboat
charters, Nauti Nymph "would be put in front of [the guest]
first for them to choose whether they wanted to use Nauti Nymph
or choose one of the other vendors in the V.I." (Id. 21:20-24.)
Beyond allowing Nauti Nymph to provide brochures through the
hotel's concierge desk, and allowing Nauti Nymph to use the
hotel's dock to tie up, pick up, and discharge, Kazyak was
unaware of anything else provided by CBI to Nauti Nymph. (Kazyak
Dep. 28:5-12.) Finally, Kazyak testified that twenty-five
percent of gross receipts for Nauti Nymph charters went to CBI

*Mannion v. East End Watersports, et al.*
Civil No. 2013-61
Memorandum Opinion
Page 23

and, through a management fee, were passed on in part to

Rosewood. (*Id.* 17:8-11; 31:5-10.)

Thomas testified during her deposition regarding the

general circumstances as to how charters are booked at Caneel

Bay.  Specifically, she stated that charters are booked through

the hotel's concierge. (Thomas Dep. 20:12-13.) Thomas stated

that hotel guests were told that the hotel was not providing the

charter, but that it was done through an independent company.

(*Id.* 20:21-24.)

CBI and Rosewood also direct the Court to the excursion

agreement which stated, in pertinent part, that the

> Resort shall endeavor to encourage the use of
> the Activities by the guests and patrons of the
> Resort; provided, however, that notwithstanding
> anything contained in this Agreement to the
> contrary, nothing shall prohibit Resort's guests
> and patrons from entering into agreements with
> the other providers of the Activities directly.

(ECF No. 93-3, Ex. C.) The excursion agreement further stated

that the relationship of Nauti Nymph and CBI, as operated by

Rosewood, did not create a joint venture or a partnership

between Nauti Nymph and the hotel. (*Id.*) The excursion agreement

specified that employees of Nauti Nymph were not employees of

CBI or Rosewood for any purpose. (*Id.*)

The Court first considers whether there was an express or

implied agreement demonstrating the parties' intent to form a

*Mannion v. East End Watersports, et al.*
Civil No. 2013-61
Memorandum Opinion
Page 24

partnership or joint venture. *Int'l Raw Materials*, 978 F.2d at 1332. Where the agreement at issue contains clear language regarding the parties' intent to form, or not form, a joint venture or partnership, courts have given credence to that express intention. *See, e.g.*, *Davidson v. Enstar Corp.*, 848 F.2d 574, 578, *on reh'g*, 860 F.2d 167 (5th Cir. 1988) (5th Cir. 1988). Here, there is an express excursion agreement.  That agreement clearly states that it is not intended to create a partnership or joint venture. Far from demonstrating an intent to form a partnership or joint venture, it explicitly attempts to do the opposite. It would be error for the Court to ignore this fact. *See, e.g.*, *id.* at 579 ("Because the JOA negates the appellees' intent to form a joint venture, the district court erred in concluding, as a matter of law, that the parties were doing business in that form.")

The Court next considers whether the parties shared a common interest in the subject matter of the venture. *Id.* A common interest exists where there is "a commonly shared incentive between the parties as to the progress and goals of the joint venturers." *MetroplexCore, L.L.C. v. Parsons Transp., Inc.*, 743 F.3d 964, 976 (5th Cir. 2014). That is, there must be a "joint proprietary interest and a right of mutual control over the subject matter of the enterprise." *In re PCH Assocs.*, 949

*Mannion v. East End Watersports, et al.*
Civil No. 2013-61
Memorandum Opinion
Page 25

F.2d 585, 599 (2d Cir. 1991). The venture in this matter

involved the provision of boating excursions.  Neither CBI nor

Rosewood itself provides boating excursions. Furthermore, CBI

and Rosewood have demonstrated through record evidence that they

lacked control over the excursions themselves, and only had

permission to screen Nauti Nymph employees, audit Nauti Nymph,

and ensure Nauti Nymph had adequate insurance and business

licenses.

The Sixth Circuit, in *Westgate Village Shopping Center v.*

*Lion Dry Goods Co.*, 21 F.3d 429 (6th Cir. 1994), stated that

where there was not "an equal right or authority to direct and

govern the movements and conduct of the other," there was not a

community of interest sufficient for the creation of a joint

venture. *Westgate*, 21 F.3d at 6.

Here, though CBI and Rosewood had a limited monetary

interest in the sale of excursions, they lacked any authority to

direct or govern the movements or conduct of Nauti Nymph.  Such

a lack of mutual control counsels against finding a community of

interest and control existed here.

Third, the Court considers whether the parties shared

profits and losses from the venture. *Int'l Raw Materials*, 978

F.2d at 1332. "The element of profit sharing, though perhaps not

conclusive, is also an important element in deciding whether or

not a joint venture existed. Though the contract did not provide
for a sharing of losses, the absence of such an agreement is not
decisive of the issue." *First Mechanics Bank of Trenton, N.J.,
v. Comm'r of Internal Revenue*, 91 F.2d 275, 278 (3d Cir. 1937).
Where one party can profit from the venture while the either
suffers losses from the venture, there is not a sharing of
profits and losses. *See Transit Mgmt. of Se. Louisiana, Inc. v.
Grp. Ins. Admin., Inc.*, 226 F.3d 376, 385 (5th Cir. 2000).

The evidence put forth by CBI and Rosewood establishes that
CBI received twenty-five percent of the gross sales received
from the sale of Nauti Nymph excursions to Caneel Bay guests.
Thereafter, Rosewood received a portion of such revenue through
its management fee. Gross sales is defined by the excursion
agreement as including a fee owed to the National Park Service,
to be paid by the hotel out of the twenty-five percent fee, and
the sale of all goods, wares, merchandise, and activities by
Nauti Nymph as related to Caneel Bay guests. It explicitly
excludes most forms of losses, such as damages, the cost of fuel
and oil, and captain fees. This agreement, by transferring money
from gross sales, allows CBI and Rosewood to collect even if
Nauti Nymph ultimately loses money on the excursion. Though CBI
and, through the management fee, Rosewood, shared in the receipt
of some profit and some, though very few, of the expenditures

*Mannion v. East End Watersports, et al.*
Civil No. 2013-61
Memorandum Opinion
Page 27

made in furtherance of the boat excursions, their revenue was severable from that of Nauti Nymph. As such, this factor counsels against a finding of joint ventureship.

Finally, the Court considers whether the parties had joint control or the joint right of control over the venture. *Id.* The evidence submitted by CBI and Rosewood suggests that there was not a joint right of control over the provision of boating excursions. Kazyak testified that the hotel did not exercise control over any of Nauti Nymphs operations. The excursion agreement allowed very limited interference into Nauti Nymph's business operations – audits, and screening potential employees – but went no further.

Considering these four factors on balance, CBI and Rosewood do not appear to have been involved in a joint venture or a partnership with Nauti Nymph.[4] *See Int'l Raw Materials*, 978 F.2d at 1332.

––––––––––––––––––––––––––––––––

[4] Mannion argues that Caneel Bay and Rosewood are not entitled to judgment as a matter of law. In support of this argument, Mannion directs the Court to Title 26 of the Virgin Islands Code, which governs partnerships in the Virgin Islands. Title 26, Section 22 provides in pertinent part that

> In determining whether a partnership is formed, the following rules apply:
>
> * * *
>
> (2) The sharing of gross returns does not by itself establish a partnership, even if the persons sharing them have a joint or common right or interest in property from which the returns are derived.

*Mannion v. East End Watersports, et al.*
Civil No. 2013-61
Memorandum Opinion
Page 28

That the excursion agreement allowed CBI to book tickets on behalf of passengers of Nauti Nymph charters and to receive payment for those tickets does not itself alter this analysis. In *Weade v. Dichmann, Wright & Pugh*, 337 U.S. 801 (1949), the Supreme Court of the United States considered whether a ticketing agent for a shipping vessel could be held liable for negligence occurring on the vessel itself. *Weade v. Dichmann, Wright & Pugh*, 337 U.S. 801, 1330 (1949). In that case, Dichmann, Wright, and Pugh ("Dichmann") was contracted by the War Shipping Administration in the Department of the Navy to arrange for the transportation of passengers on War Shipping Administration ships. *Id.* at 806. The contract called for the actual transportation to be carried out by the War Shipping Administration. *Id.* Lillian Weade and Roberta Stinemeyer purchased tickets through Dichmann and embarked on a steamboat owned by the War Shipping Administration. *Id.* at 802-03. While

---

(3) A person who receives a share of the profits of a business is presumed to be a partner in the business . . . .

V.I. CODE ANN. tit. 26, § 22.  Mannion asserts that because Caneel Bay collected twenty-five percent of the gross sales of Nauti Nymph excursions to Caneel Bay guests, the Virgin Islands Code presumes partnership.

Though a person who receives a share of profits is presumed to be a partner in the business, a person who shares in the gross returns is not. *See* V.I. CODE ANN. tit. 26, § 22. The sharing that occurred here, to the extent it can be considered "sharing," was that of gross returns – including profits and expenses – not simply the sharing of profit.  As such, even under the Virgin Islands Code there would be no presumption of partnership.

on board the steamboat, Weade was assaulted by a crewmember and injured. *Id.* at 803. Weade sued Dichmann for her injuries. *Id.* The Supreme Court found that, where the ticketing agent's duties "ended at the shore line," the ticketing agent was not liable for the acts occurring on a common carrier vessel. *Id.* at 807.

Here, as in *Weade*, CBI sold tickets on behalf of a vessel, or group of vessels. Also as in *Weade*, CBI did so in accordance with a contractual agreement between CBI, the ticketing agent, and Nauti Nymph, the actual provider of maritime services. This arrangement ended at the water, with CBI having no obligations once the tickets had been sold. The Court thus finds *Weade* instructive on the issue of whether the arrangement between CBI and Nauti Nymph subjected CBI to agency liability for the acts of Nauti Nymph or its captains.[5]

---

[5]    Joint ventureship or partnership would result in actual agency. There is a second form of agency which the Court has to address. "Apparent authority is the power held by an agent or other actor to affect a principal's legal relations with third parties when a third party reasonably believes the actor has authority to act on behalf of the principal and that belief is traceable to the principal's manifestations." Restatement (Third) Of Agency § 2.03 (2006).

In their motion for summary judgment, CBI and Rosewood argue that neither Nauti Nymph nor Charette were apparent agents of CBI or Rosewood. Specifically, they argue that Mannion has failed to even allege any facts which indicate reliance on an agency relationship. "[A] party who moves for summary judgment on the ground that the nonmoving party has no evidence must affirmatively show the absence of evidence in the record." *Celotex Corp.*, 477 U.S. at 332.

In reviewing the record evidence, the Court finds several things to be of note.  First, that the excursion agreement is quite explicit in its attempt to keep the hotel and Nauti Nymph separated to the extent possible.

*Mannion v. East End Watersports, et al.*
Civil No. 2013-61
Memorandum Opinion
Page 30

## C. Burden of Proof for Summary Judgment

The movant has the initial burden of showing there is no genuine issue of material fact, but once this burden is met it shifts to the non-moving party to establish specific facts showing there is a genuine issue for trial. *Gans v. Mundy*, 762 F.2d 338, 342 (3d Cir. 1985). Here, as discussed above, CBI and Rosewood have met their burden of proof as to Count One, negligence, as alleged by Mannion.  As such, that burden now shifts to Mannion.

The Court has thoroughly reviewed Mannion's submissions, including her opposition and the evidence submitted on the record.  None of that evidence contradicts that which was adduced by CBI and Rosewood in such a way that either defendant

---

Second, that Kazyak and Thomas both indicated in their testimony that it is made clear to guests, through literature and the concierge, that Nauti Nymph is a separate company. Third, the Court notes that the contract signed by Goldfield explicitly mentions both Nauti Nymph and Charette, but does not mention even the mere existence of the hotel. Finally, the Court notes a lack of evidence of any kind which shows that Mannion believed at any time that Nauti Nymph or Charette was acting on the hotel's behalf.

Mannion argues in her opposition that the facts support her reasonable belief that Nauti Nymph and Charette were agents of Caneel Bay.  In support of this contention, Mannion directs the Court to a statement of facts drafted in opposition to the motion for summary judgment.  That statement of facts, far from supporting this argument, actually contradicts it.  Mannion's statement of facts, relying upon deposition testimony of Mannion herself, states, "At no time did Plaintiff know or, to her knowledge, did any member of her family know that Caneel Bay and [Nauti Nymph] had some kind of partnership arrangement." (ECF No. 96-3, ¶ 19.) A thorough review of the deposition testimony and affidavits of both Goldfield and Mannion also fails to reveal that either held any belief as to the authority of Nauti Nymph to act on behalf of CBI or Rosewood.

*Mannion v. East End Watersports, et al.*
Civil No. 2013-61
Memorandum Opinion
Page 31

would not be entitled to judgment as a matter of law.  As a result, summary judgment is appropriate as to Count One.

Turning next to Count Two, gross negligence, the Court notes that an essential and intrinsic element to a claim of gross negligence is negligent conduct.  As CBI and Rosewood have shown that, as a matter of law, there was no negligent conduct here, they are entitled to summary judgment on Count Two, as well.

## V.  CONCLUSION

CBI and Rosewood have shown they had no duty to Mannion in these circumstances. For the reasons discussed herein, CBI and Rosewood are thus entitled to judgment as a matter of law on Counts One and Two.

S_____
        **Curtis V. Gómez**
        **District Judge**